## UNITED STATES v. KEMMERER et al.

(District Court, E. D. Pennsylvania. November 25, 1924.)

No. 145.

Shipping ☞181—Charterer held not liable for demurrage.

Delay in loading a ship with coal at the port of Philadelphia in winter *held* due to a congestion of ice at the dock, which prevented the loading of vessels previously registered for loading there, and the proximate cause of such delay *held* due to "frost," which, under the charter party, excluded such time from the lay days for loading.

Decree affirmed in 7 F.(2d) 187.

Harold F. Birnbaum, of Brighton, Mass., and Arthur M. Boal, of Washington, D. C., for libelant.

Otto Wolff, Jr., Alfred G. Baker Lewis, and John F. Lewis, all of Philadelphia, Pa., for respondents.

McKEEHAN, District Judge. This is a libel by the United States of America, as owner of the steamship Cœur D'Alene, against Whitney & Kemmerer, to recover demurrage alleged to have been earned in the port of Philadelphia in February, 1922; the amount claimed being $28,141.95, together with interest and costs. Under a written contract of affreightment between the parties, dated January 26, 1920, the libelant agreed to carry a cargo of coal for the respondents from Philadelphia to St. Nazaire, France, for $22.50 per ton. The respondents engaged "to provide and to furnish the said steamer a full and complete cargo of about 6,000, 10 per cent. more or less, ship's option, tons of coal, underdeck." The clause of the contract prescribing the time allowed for loading coal, was as follows:

"4. Lay days for loading, if required by the party of the second part, not to commence before January 26, 1920; otherwise, lay days to commence from time steamer is ready to load (or within 48 hours after readiness to load if delayed awaiting turn at berth) and master has given notice in writing, of such readiness to the party of the second part or his agent, who is ―――. Should the steamer not be ready for cargo at her loading port on or before January 31, 1920, the party of the second part, or his agent, may at his option cancel this contract of affreightment at any time not later than the day of the steamer's readiness to load. Cargo to be loaded into steamer with customary dispatch, in accordance with the rules of the port of loading, but in no case at less than 1,500 tons per running day, Sundays and legal holidays excepted. Any time lost through riots, strikes, lockouts, or disputes between masters and men, at docks, or by reason of floods, frost, fogs, or storms, or by reason of accidents to ship's tackle, winches, equipment, or other disability of the ship which prevents her taking cargo. that occasions a stoppage of delivery of coal to said steamer, is not to be computed as

part of the loading time. In the event of any stoppage or stoppages arising from any of these causes and continuing for a period of six running days from the time when the steamer is ready to load, party of the first part may, at its option, terminate this contract, without prejudice, however, to any rights of action which it may have; if any cargo shall have been loaded prior to the exercise of this option, same shall be discharged at the risk and expense of the party of the second part."

On January 27, 1920, at 10:30 a. m. at the Walnut street wharf, Philadelphia, the Cœur D'Alene registered her readiness to take on cargo. The coal was to be loaded at Greenwich Point, but vessels intending to load there were privileged to register at the Pennsylvania Railroad freight offices at the Walnut street wharf, and were then ordered to dock at Greenwich Point in the order of their registry and as soon thereafter as possible. While no written notice was given by the vessel to the respondents, the latter received prompt advice by telephone from the ship's agent that the vessel was ready. It happened at that time that severe winds and cold weather prevailed at the port of Philadelphia, which greatly delayed the loading of ships. There was a great deal of ice in the Delaware river, which rendered the docking of the ships difficult and at times impossible. In addition, the cold weather froze the coal, and after it reached Greenwich Point from Harrisburg (which was the central storage point, from which coal was brought to Greenwich Point on a few hours' notice, when and as needed, to prevent congestion at the latter place), it was necessary to thaw it out at the thawing plant at Greenwich Point, so that it would flow from the cars.

Vessels of substantial size could be loaded only by the car dumper, which dumped coal direct from the car to the vessel by a machine operation, though sometimes smaller boats could be loaded at other parts of the dock. Only one vessel of any size could be loaded at one time. When the Cœur D'Alene registered, six vessels which had previously registered were still awaiting their turn to load at Greenwich Point, and the superintendent at Greenwich Point ordered them in as rapidly as conditions permitted. The Balto, which had registered on January 15th, was loaded on January 28th, the delay being due to the weather. The Carolinian, which had registered on January 23d, was next loaded; next, on January 31st, the barge A. H. Allyn, which had registered on

January 23d; then, on February 2d, the F. Luckenbach, which had registered on January 26th. On February 5th the superintendent ordered in the Deva, which had registered on January 26th. She reported that she was unable to dock on account of the ice. He then ordered in the J. L. Luckenbach, which was next in order of registry, and she refused for the same reason. He then, still on February 5th, ordered in the Cœur D'Alene, but the master made the same report, namely, that he could not dock on account of the ice.

As none of these vessels could dock, the superintendent loaded such small boats as he had in dock and could secure for harbor use, and on the next day reverted to the order of registry and ordered in the Deva. She was loaded; then the J. L. Luckenbach; and on February 10th, at 2:40 p. m., the Cœur D'Alene was again ordered in. She docked on that day at 5 p. m. The loading started shortly after midnight—that is, at 12:30 or 1:30 a. m.—on February 11th and was completed in a little over 24 hours; the vessel being fully loaded by February 12th, at 2:15 a. m.

It is clear that no one was at fault in the sense that no one refused or neglected to do anything that he could have done to load the Cœur D'Alene more promptly. The respondents, Whitney & Kemmerer, had more than enough coal on hand at Harrisburg to supply the cargo, and it could have been shipped to Greenwich Point at any time, and in ample time to be there as soon as the vessel was able to receive it. It was in fact so shipped, and was in readiness when the Cœur D'Alene docked. The master of the ship promptly refused to dock his vessel on February 5th, as he could not have done so safely because of the ice. The superintendent at Greenwich Point acted under the directions of the United States Railroad Administration, which then had control of the railroads, in loading the vessels in the order in which they registered at this port. It may be remarked that this rule of the Railroad Administration was simply a continuance of the practice that had existed prior to the government's taking control of the railroads. No question of willful fault or neglect is involved. The question is simply: Where does the loss arising from the delay belong, under the agreement that the parties made for themselves?

My opinion is that, under the terms of the contract and the facts of the case, the loss rests upon the libelant, and that the re-

spondents are not liable for demurrage. The material provisions of article 4 of the contract are, in substance, that the time for loading was to begin from the time the steamer was ready to load, or within 48 hours thereafter, if the vessel was delayed awaiting turn at berth. This means that, if a delay was caused by awaiting turn at berth, a period of 48 hours' grace was allowed the respondents, and that after the expiration of that period demurrage ran against them. But this provision, and all of the provisions of this article, are subject to the further provision that "any time lost through riots, strikes, * * * or by reason of floods, frost, fogs, or storms, * * * that occasions a stoppage of delivery of coal to said steamer, is not to be computed as part of the loading time." Thus, if the delay is caused by awaiting turn at berth, the respondent is charged with demurrage after a period of 48 hours' grace; but if the delay is the result, inter alia, of frost or storms that occasion a stoppage of delivery, the time lost is not to be computed as part of the loading time.

What is a "stoppage of delivery"? Counsel for libelant first contended that these words refer only to a cessation after loading has once begun; but, as is frankly recognized in their brief, this construction is impossible, in view of the latter part of article 4, which, after providing that, if any stoppage continues for 6 days, the owner may terminate the contract, expressly stipulates that, if any cargo shall have been loaded prior to the exercise of the option, the same shall be discharged at the expense of the shipper. This implies, of course, that a stoppage may occur before any cargo has been loaded.

The libelant now contends that "stoppage" means that delivery shall be at a standstill; whereas, the evidence is that the storms and ice prevailing in January and February did not completely stop the loading at Greenwich Point during these months, but only reduced it to about 50 per. cent. of normal. This argument, I think, is beside the point. There was no "stoppage" during the period in which the Cœur D'Alene was actually being loaded. In fact, she was loaded very expeditiously, i. e., in 24 hours. If the loading operation had extended, say, over a period of 10 days, because for one reason or another only 10 per cent. of the normal amount of coal could be put in the vessel's hold in one day, the libelant's contention would be relevant. No loading was done on

the Cœur D'Alene from January 27th, the day on which she registered, until February 11th. This was the "stoppage," and the question is whether all or part of this stoppage was occasioned by delay awaiting turn at berth, or whether all or part of it was occasioned by frost or storms.

I think that, under the evidence, the entire delay in loading the Cœur D'Alene was due to ice and storms. It may be argued that, after all, a number of vessels docked and were loaded between the date of the Cœur D'Alene's registry and the date on which she was loaded; that on certain of these days vessels could not dock, but on other days they could; and that therefore most of the delay in loading the Cœur D'Alene was due to the fact that she was awaiting turn at berth, while vessels of earlier registry were being loaded. But I think that this is not the true view of this contract and of the actual facts of the situation. Mr. Doran, who has been the Pennsylvania Railroad coal agent at Greenwich pier since 1907, and who at the period under discussion was the agent of the Railroad Administration at the coal terminal piers at Greenwich Point, expressly testified that, if it had not been for the weather conditions, there would have been no delay in loading the Cœur D'Alene. He testified (page 48):

"Q. To get clear what I have in mind, is it, or not, the fact that, if it had not been for this extraordinary frost, there would have been no disability of the Cœur D'Alene getting in to load her cargo? A. That is a fact."

Harry P. Hannum, assistant trainmaster, who had supervision of the Greenwich coal piers, testified (page 63):

"Q. In other words, in pursuance of your own orders, the coal was held at Harrisburg. Is that right? A. Yes. I would not let it come in here and congest this port, when I knew the conditions. If we had been working under ordinary conditions, we would not have had any demurrage on any ship.

"Q. Those conditions were due, or were not due, to extraordinary frost? A. Yes.

"Q. Extraordinary frost, ice, windstorms? A. And so forth. On this particular night of the 5th I was in here myself, and you could not get a boat in. If the steamship people won't put a boat in, then you can't load it.

"Q. What was the condition of the Delaware river docks with reference to ice? A. It looked like mountains."

George S. Bliss, in charge of the United

States Weather Bureau at Philadelphia, testified (pages 70 and 71):

"Q. Referring to these records, will you tell us what the weather conditions were during the month of January, 1920? A. January was a cold month. The temperature averaged 5 degrees below normal; that is, there was an accumulated deficiency for the month of 158 degrees for 31 days. There were several severe cold spells during the month, cold waves, one on the 3d, lasting on the 4th and 5th; about three days there. Then there was another one on the 16th, and a fairly cold wave on the 19th and 20th, and again on the 26th, and then at the end of the month, on the 31st, we had the most severe of all.

"Q. How severe was it? A. A minimum temperature of 5 on the 31st, 5 above zero. As I stated before, the average temperature for that month was 5 degrees below the January normal.

Q. What were the conditions prevailing in February, 1920? A. February was not so cold. There was an accumulated deficiency of 44 degrees for the 29 days. There were some very bad storms in February.

"Q. When was the first storm in February? A. Beginning on the 4th. It began just before midnight of the 3d and 4th.

"Q. Tell us about that storm. A. It was a very heavy sleet storm on February 4. There was a continuation of rain, sleet, and snow. There was a sleet fall of 3 inches, a snowfall of 1½ inches on that day. That is very unusual to get that much sleet. On the 5th of February, 1 inch of sleet and a half inch of snow. On the 6th of February, 1½ inches of sleet and 1.2 inches of snow, in the three days' storm. That made a total of 5½ inches of sleet and 3.2 inches of snow for three days.

"Q. Is that something unusual or extraordinary? A. That was one of the heaviest sleet storms that we have on record, and we had high winds most of the time during that storm. The highest winds were on February 4, the first day of the storm, with a maximum wind of 30 miles from the northeast."

The question in this case is in a sense one of proximate cause. The real intent of this contract was to eliminate from the allowed time of loading any stoppage caused by ice or storm. If it is a fact, and I find that it is a fact, that it was the storms and the ice that so slowed up operations at Greenwich Point that, instead of being able to take vessel after vessel and load them imme-

diately after registry at this port, an accumulation of vessels occurred, with the result that, taking the vessels in order of registry, the Cœur D'Alene was not able to dock until February 10th, then I think that, within the meaning of this contract, the ice and the storms were what stopped the loading of coal on this vessel, and postponed it until February 10th. To find that the stoppage was caused by delay in awaiting turn at berth would be, I think, to substitute a resulting secondary cause for the real and primary cause.

The libel is dismissed, at the cost of the libelant.